UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  v.<br><br>NEIL A. VAN DYCK,<br><br>        Defendant. | No. 2:15-cr-00200-GEB<br><br>**ORDER DENYING RELATORS' MOTION TO INTERVENE** |

Qui tam Relators ("Relators") move for an order authorizing them to intervene in the forfeiture component of this criminal case arguing, *inter alia*, they are authorized to intervene under the "alternate remedy" provision in the False Claims Act (FCA), prescribed in 31 U.S.C. § 3730(c)(5). Specifically, Relators contend that the forfeiture component of this criminal case constitutes the government's "election" under § 3730(c)(5) to pursue fraudulently obtained money from Defendant Van Dyck that could have instead been recovered in Relators' prior-filed qui tam civil lawsuit, which contains allegations about the same fraudulent conduct. (Qui Tam Relators' Am. P. & A. ISO Mot. to Disburse Forfeiture Funds, & Request for a Status Conference ("Mot.") 3:1-6, ECF No. 30-1.) Relators argue that the following portion of § 3730(c)(5) supports their intervention motion: "the [g]overnment may **elect** to pursue its [fraud] claim

1

through any alternate remedy available to the [g]overnment, including any administrative proceeding to determine a civil money penalty[, but i]f any such alternate remedy is pursued in another proceeding, the person initiating the [qui tam civil] action shall have the same rights in such [alternate] proceeding as such person would have had if the [government had pursued the fraudulently obtained money in the qui tam civil lawsuit] . . . ." 31 U.S.C. § 3730(c)(5) (emphasis added).

Relators contend their motion should be granted "[u]nder the qui tam provisions . . . [requiring] the government . . . to share with Relators a percentage of the" money that Defendant Neil A. Van Dyck will forfeit to the United States in this criminal case. (Mot. 10:24-25.)

> Under the [FCA], any person who defrauds the United States Government is liable for civil penalties. 31 U.S.C. § 3729 (1994). [T]he FCA requires the Attorney General to investigate possible violations, id. § 3730(a), [and] also permits civil qui tam actions by private persons, known as relators, id. § 3730(b). In a qui tam action, the relator sues on behalf of the government as well as [herself]. If the relator prevails, [she] receives a percentage of the recovery, with the remainder being paid to the government.

U.S. ex rel. Biddle v. Bd. of Trs. of Leland Stanford, Jr. Univ., 161 F.3d 533, 535 (9th Cir. 1998).

Relators "bear[] the burden of showing" their motion to intervene should be granted. Prete v. Bradbury, 438 F.3d 949, 954 (9th Cir. 2006).

The United States opposes the motion, arguing, *inter alia*, that its investigation of Van Dyck preceded the date on which Relators filed their qui tam lawsuit, and that Relators

2

have not provided evidence showing that the government made a statutory "election" under § 3730(c)(5); hence, the "alternate remedy" provision in § 3730(c)(5) does not confer a right in Relators to intervene in this criminal case. Specifically, the United States argues:

> **For the United States to "elect" to pursue its [FCA] claim through an "alternate" to the qui tam action, there must have been both the qui tam action and the alternate remedy from which to choose—i.e., the qui tam action must have been in existence at the time the United States pursued the alternate remedy. In this case, however, the United States' criminal investigation of Van Dyck was initiated before and independent of Relators' qui tam action.** In fact, Relators are not the first sources of the information that led to the criminal prosecution of Van Dyck. . . .
>
> In early 2011, SGS—a contract investigator for the United States—had uncovered Van Dyck's pattern of health care fraud and recommended that the United States investigate Van Dyck for potential criminal action. Based on SGS's June 2011 referral, the United States investigated and subsequently charged Van Dyck. Under these circumstances, it would be unfair to the victims to allow Relators to share in the criminal recovery because the relator did not uncover the fraud in the first place. Relators came forward with their qui tam action only after SGS had completed its fraud investigation and the United States had contacted Van Dyck's patients about their treatments. Thus, the instant criminal proceeding cannot constitute an election of an "alternate" remedy under the plain language of the statue, assuming that criminal proceedings could ever be an alternate remedy under the [FCA].

(United States' Opp'n to Mot. ("Opp'n") 14:1–15:1, ECF No. 32 (emphasis added) (citations omitted).)

Relators rejoin, arguing they "were the first sources of information that led to uncovering of Defendant Van Dyck's

3

splitting [of Dermagraft synthetic skin material,] and [the] fraudulent billing for Dermagraft synthetic skin material, and they provided the critical direct link between the fraudulent billings and records and Dr. Van Dy[ck] making his conviction in this [criminal] action possible." (Am. Reply 11:15-18, ECF No. 33.) Relators also argue: "Through their *qui tam* filings and disclosures provided to the Government[,] Relators disclosed specific and detailed information regarding Dr. Van Dyck's fraud relating to the splitting and illegal use of Dermagraft." (Am. Reply 9:5-7.) Relators contend this fraudulent billing is part of the factual basis supporting Van Dyck's guilty plea. Relators also argue "[t]his is from a copy of the [search] warrant [affidavit averments] filed as Exhibit A to [the] Government's opposition, which makes no mention of Dermagraft or any suspicions that Dr. Van Dyck was cutting and billing for synthetic skin material in violation of Medicare regulations." (Am. Reply 8:28-9:3.)

        The United States rejoined at the hearing on the intervention motion that Relators do not know what information the United States possessed before Relators disclosed information to the government.

        Relators responded that their attorney's declaration, filed in support of their intervention motion, contains facts demonstrating this criminal case is based on information Relators gave the United States. Van Dyck rejoined that the contents of Relators' attorney's declaration are merely unfounded and conclusory assertions consisting solely of bare arguments lifted from Relators' intervention briefs.

Relators' attorney avers in the referenced declaration:

> Sometime during the summer or fall months of 2012, Relators' attorneys advised the Assistant United States Attorney, Colleen Kennedy that Relator Smith had, during her employment with Dr. Van Dyck, been gifted a computer that was utilized to do office billing and office calendaring of patients. **The computer had not been operated and was stored in Relator Smith's garage for several years. The government was advised that it contained valuable billing information that would show the pattern of fraudulent billing going back many years.**

(Am. Decl. of Gary Callahan ISO of Mot. ("Callahan Decl.") ¶ 7, ECF No. 30-3 (emphasis added).)

Relators' attorney also declares:

> It is your **declarant's understanding that the computer** is still in the government's possession and **has been utilized in the government's investigation**. The importance of the computer to the case is that it shows a long-standing pattern naming the dates, times, places, and patients that unwittingly became a part of the fraudulent scheme. All of this information emanating from the Relators.

(Callahan Decl. ¶ 7 (emphasis added).)

However, Relators have not shown that their attorney possesses personal knowledge of what he avers. The averment that "[t]he computer had not been operated and was stored in Relator Smith's garage for several years" does not evince that Relators' attorney then knew what information was on the computer. Nor does the attorney's assertion of what he "understands" evince that he had personal knowledge of what he avers after use of this word. See Cermetek, Inc. v. Butler Avpak, Inc., 573 F.2d 1370, 1377 (9th Cir. 1978) (stating "facts alleged on **'understanding'** like those based on 'belief' or on 'information and belief', are not

5

sufficient to create a . . . fact"); <u>Carmen v. S.F. Unified Sch. Dist.</u>, 237 F.3d 1026, 1028 (9th Cir. 2001) (stating the declarant's "I believe" statement lacked "direct or circumstantial [evidence] to support this subjective statement").

Nor are Relators' attorney's averments sufficient evidence from which a reasonable inference could be drawn that Relators knew what evidence the government possessed when they provided information to the government. "[B]are assertions or unsupported conclusions are not facts . . . . " <u>Tovar v. U.S. Postal Serv.</u>, 3 F.3d 1271, 1279 (9th Cir. 1993). As the Ninth Circuit states in <u>Bank Melli Iran v. Pahlavi</u>, 58 F.3d 1406, 1412 (9th Cir. 1995), where it discusses "information and belief declarations from [a party's] counsel[: such evidence is] entitled to no weight because the declarant did not have personal knowledge." The burden is on the proponent of evidence to show "that a witness had personal knowledge of the facts about which he testified." <u>United States v. Joy</u>, 192 F.3d 761, 767 (7th Cir. 1999).

Information in the affidavit supporting the above referenced search warrant, (Ex. A, ECF No. 32-1), includes the following:

"In early 2011, [SafeGuard Services (SGS), an organization that is contracted by the United States to identify potentially fraudulent Medicare providers,] opened a fraud investigation of [D]efendant Neil Van Dyck." (Opp'n 3:10-14 (citing Ex. A ¶ 57).) Specifically, "[o]n or about March 29, 2011, SGS Fraud Investigator Gaye Eaton, RN (ret.), began a review of Dr. Van Dyck's practice based on the unusual billing

pattern for procedures, such as surgical nail avulsion, skin graft, and ultrasound." (Ex. A ¶ 57.)

"[I]n April 2011 SGS made an initial request for records and in November and December 2011, SGS requested follow up medical records to support Dr. Van Dyck's billing to Medicare for [the code which is used to bill for surgical nail avulsions and does not include routine foot care]." (Ex. A ¶¶ 47, 51.)

"On or about April 14, 2011, Fraud Investigator Eaton sent Dr. Van Dyck a letter . . . request[ing that] Dr. Van Dyck provide all medical records supporting the treatment of eight (8) Medicare beneficiaries for dates of service ranging from March 1, 2010 to February 28, 2011. On or about May 16, 2011, some medical records were delivered to Fraud Investigator Eaton." (Ex. A ¶ 62.)

David Kvach (Special Agent with U.S. Department of Health and Human Services Officer of Inspector General) avers that in June 2011, the U.S. Department of Health and Human Services Officer of Inspector General initiated an investigation after receiving a Medicare fraud referral from SGS, wherein SGS recommended that the United States investigate Van Dyck for potential criminal action. (Ex. A ¶ 2.)

"On or about November 30, 2011, Investigator Eaton requested Dr. Van Dyck to provide additional information regarding the medical records that Dr. Van Dyck furnished to SGS on May 16, 2011." (Ex. A ¶ 70.)

"On December 5, 2011, in response to Investigator Eaton's supplemental records request dated November 30, 2011, Investigator Eaton received a phone call from someone who

identified herself as 'Nancy' and said she worked at Dr. Van Dyck's office. Nancy (subsequently identified as [Relator] Smith) asked for additional information to assist Dr. Van Dyck in fulfilling Investigator Eaton's request." (Ex. A ¶ 71.) "On January 12, 2012, Investigator Eaton received a packet containing some of the requested supplemental documents from Dr. Van Dyck." (Ex. A ¶ 73.)

"In January 2012, the United States then requested from numerous patients information pertaining to their treatments from Van Dyck." (Opp'n 4:4-7; see also Ex. A ¶ 84 ("On or about January 9, 2012, at the request of [U.S. Department of Health and Human Services Officer of Inspector General] Case Agent, Investigator Eaton sent Medicare Questionnaire letters to approximately 47 randomly selected Medicare beneficiaries who were patients of Dr. Van Dyck.").)

"Some of the requested records [from Van Dyck] were received by SGS on January 12, 2012." (Ex. A ¶ 51.)

"On February 8, 2012, [the hotline] received an anonymous Complaint regarding Dr. Van Dyck. The anonymous caller [later identified as Relator Smith] stated she was an employee of Dr. Van Dyck. She alleged that Dr. Van Dyck billed Medicare for nail avulsions when his patients only received routine foot care such as nail trimming." (Ex. A ¶¶ 30, 34.)

These averments establish that the United States commenced a fraud investigation of Van Dyck before Relators filed their qui tam action on July 6, 2012, (see Mot. 3:8-10), and also that the investigation was ongoing and eventually resulted in the filing of the instant criminal case on September 28, 2015.

Relators have not shown the import of the information that was provided to the government's investigation and/or prosecution of Van Dyck; nor whether the information was possessed by the government before Relators provided information to the government. Therefore, the record does not support Relators argument that the government made an "election" under § 3730(c)(5) that justifies Relators' request to intervene in the forfeiture component of this criminal case.

Relators suggested during the hearing on the § 3730(c)(5) portion of their intervention motion that if doubt exists concerning the propriety of intervention, then perhaps an evidentiary hearing should be convened on this portion of the motion. However, "[a]n evidentiary hearing on a [criminal] motion . . . ordinarily is required if the moving papers are sufficiently definite, specific, **detailed**, and **nonconjectural** to enable the court to conclude that contested issues of fact going to the validity of [a constitutional or statutory right] are in issue." United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986); United States v. Howell, 231 F.3d 615, 620 (9th Cir. 2000) ("An evidentiary hearing on a [criminal] motion . . . need be held only when the moving papers [contain] facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist."). Relators have not satisfied the standard applicable to authorizing an evidentiary hearing.

Relators also assert they have the right to intervene under 21 U.S.C. § 853(n), arguing:

> [P]ursuant to 21 U.S.C. § 853(n), a third

> party may intervene in a criminal forfeiture proceeding and petition for a court hearing to adjudicate the validity of his or her alleged interest in the property. As described above, Relators are partial assignees of [g]overnment's claims pursuant to their qui tam action. The qui tam complaint alleges the same fraudulent conduct and seeks recovery of the same funds as forfeited by Defendant Van Dyck in the instant case.

(Mot. 11:12-20 (citation omitted).) However, Relators have not shown that they have a recognized interest in the criminal forfeiture proceeding. Therefore, this portion of their motion is also denied.

Lastly, Relators request in their reply brief that the Court exercise its "inherent power" to sanction, on the basis of the United States' purported "disregard in relation to Relators' known entitlement to the forfeiture funds"; Relators assert the forfeiture funds are their property, "as [Relators are] partial assignees of [the] government's damages claims in their pre-existing FCA action." (Am. Reply 15:20-27, 2:14-15.) However, "[t]he district court need not consider arguments raised for the first time in a reply brief." Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007). Therefore, this request is disregarded.

For the stated reasons, Relators' motion to intervene in this criminal case is DENIED.

Dated:  March 29, 2016

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge

10